UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MARTANE H. WADE,<br><br>Defendant. | Case No. 2:18-cr-00155-MMD-CWH<br><br>**REPORT AND RECOMMENDATION** |

Presently before the Court is defendant Martane H. Wade's motion to suppress (ECF No. 38), filed on December 3, 2018. The government filed a response (ECF No. 39) on December 12, 2018, and Wade filed a reply (ECF No. 43) on December 21, 2018. A hearing was conducted on January 29, 2019. (Mins. of Proceedings (ECF No. 44).) At the hearing, the court admitted into evidence the government's exhibits 1A, 2A, 3A, 4A, 5, and the government's later-produced compact disc recordings as exhibits 1, 2, 3, 4. (*Id.*) Wade filed a post-hearing brief (ECF No. 48) on February 15, 2019, and the government responded (ECF No. 49) on February 22, 2019.

**I.   BACKGROUND**

Shane Nester, a Drug Enforcement Agency (DEA) agent assigned to the Las Vegas, Nevada office, testified that he learned that DEA agents in Montana developed information from a confidential source (CS) about drug sales in Las Vegas being conducted by a person nicknamed "Roach." The CS reported that he had purchased methamphetamine from Roach. The CS provided Roach's telephone number, physical description, and said that he drove a white BMW. The CS knew the location of the apartment used by Roach, and that he had a "stash house" in North Las Vegas.[1]

---

[1] Agent Nester testified that a "stash house" is a place where drug dealers store narcotics, cash, drug trafficking materials, or records, or a combination of those items. A drug dealer could have more than one stash house, and locations are changed frequently for the dealer's protection.

Using this information, Agent Nestor's investigation revealed that the telephone number was connected to Wade, that Wade had previously been arrested for drug related activity, and had in the past used an apartment at Harbor Island Apartments in Las Vegas as his address. Agent Nestor also obtained Wade's driver's license with photograph, and discovered that Wade owns a white BMW X6 automobile registered in California. With the assistance of the Montana DEA, the CS confirmed that Roach looked like the person depicted in the license photograph of Wade, and that the white BMW looked like Roach's car.

On April 24, 2018, while Agent Nestor listened, the CS made a recorded telephone call to Wade. The CS identified himself and that he was calling on a different phone that usual, and Wade seemed to immediately recognize who he was talking to. The CS told Wade that he would be coming to Las Vegas, and had booked a room at Palms Place, a casino. Wade asked if the CS was "leaving with anything" and if the CS would "see me [Wade] for anything that you usually see me for." The following conversation then took place:

CS: You know it, I got 6k for you, is that gonna be good for two?

D: Uh, you got 6 g's . . .

CS: I got 10 but, I mean, I'm bringing 10 because I wanna spend about 4 when I go out, you know.

D: OK, so you're gonna spend 6 with me?

CS: Yeah.

D: Yeah, I got two for ya.

CS: Two for me . . .

D: I probably only got two left . . . I probably only got two left right now.

(Ex. 1A at 1-2.)

Agent Nestor testified regarding his training and experience, and indicated he had been a Drug Enforcement Agency agent since 2009 and had participated in over 150 narcotics cases. Based upon his experience, Agent Nestor testified that "k" and "g" represented a thousand dollars. He believed that the reference to "two" was for two pounds of methamphetamine and

$6,000 was a fair price for two pounds of methamphetamine, which costs about $3000 to $3500 for an out of town buyer like the CS.

Agent Nester testified that after this telephone call, he applied for and obtained a warrant to monitor Wade's telephone in order to determine his location. Using that information and other surveillance from April 24 until May 3, 2018, he testified that he believed that Wade frequently stayed at an apartment on Katie Avenue in Las Vegas, Nevada (hereafter referred to as "Katie apartment"). DEA agents began surveillance of the Katie apartment, and saw Wade's white BMW there.

On May 3, 2018 at about 2:00 p.m., agents again set up surveillance at the Katie apartment. Later, Wade arrived at the apartment in his BMW, and was accompanied by a person who was later determined to be codefendant Jania Loyd. Surveillance agents then determined that the Katie apartment was in Loyd's name.

At about 4:23 p.m., the CS contacted the defendant in a recorded phone call, monitored by Agent Nestor. The following conversation took place:

CS:  You wanna go out tonight?

D:  Shit, I'll hang with you tonight man.

CS:  Yeah, you got that what we talked, any way you could bring a ball of the white girl along with the two?

D:  OK, you want the two right now?

CS:  Yeah, yeah, 'cause I gotta, I gotta get that outta the way. You know me, I'll blow my money otherwise. [Laughter] You know that's right. You know that's right.

D:  Don't fuckin' blow no money, Ollie damn . . . I gonna go grab the two and then I'll come man.

(Ex. 2A.) Agent Nestor testified, based upon his training and experience, that "a ball of white girl" refers to a one-eighth ounce of cocaine. He indicated that an eighth of an ounce is referred to as an "eight ball," and common slang for cocaine is "white girl." Surveillance agents notified Agent Nestor that Wade and Loyd then left the apartment in his BMW. Officers attempted to follow them but were unsuccessful.

Agent Nestor testified that at about 5:45 p.m., after about one hour and 20 minutes, Wade and Loyd returned to the Katie apartment. Once again the CS contacted Wade in a recorded phone call, monitored by Agent Nestor. The CS said that he was currently gambling at the Palms Casino,[2] and Wade said, "I just got all the shit and I'm headed to you right now." (Ex. 3A.) At 5:58 p.m., surveillance agents then followed Wade and Loyd in his white BMW, from the Katie apartment to the Palms parking lot. As Wade arrived at the Palms parking lot, he was once again speaking with the CS on a recorded line, and indicated he was going to come and meet the CS. (*See* Ex. 4A.) Agent Nestor and other agents stopped and arrested Wade, and then searched his BMW. They located approximately two pounds of substance which Agent Nestor believed, based upon his experience, to be methamphetamine in a purse on the passenger side of the BMW, and an eighth ounce of purported cocaine on the driver's side. Because the arrest occurred in the parking lot with many on-lookers, the officers transported the codefendants and the BMW to the DEA headquarters for further processing.

Once at the DEA headquarters, Detective O'Connor, a member of the group of officers working with Agent Nestor, telephonically applied for and received from a state judge a search warrant for the BMW and the Katie apartment. At the Katie apartment, Agent Nestor found a bag containing drugs packaged for sale, various drug paraphernalia, and two firearms.

After the arrest, Agent Nestor talked to Loyd, who said that Wade had complete access to her Katie apartment at all times, had a key, and left items there. Nestor further confirmed that when he searched the Katie apartment, he found men's clothing and the title for Wade's BMW.

On May 15, 2018, the government indicted Wade for possession with intent to distribute a controlled substance, methamphetamine, heroin, cocaine base, and cocaine, and felon in possession of firearms. (Indictment (ECF No. 15).) Wade now moves to suppress all of the drugs and firearms seized by law enforcement. Wade first argues that there was insufficient probable cause to arrest him. Next, he argues that the warrantless search of his vehicle was illegal. Next, he argues that the search warrant issued by the state judge was defective because

---

[2] The CS was actually in Montana.

the officers intentionally omitted critically important information. And finally, he argues that the warrant was invalid because it was insufficient to justify a nighttime search provision contained therein.

## II. ANALYSIS

### A. Applicable Legal Authority

The Fourth Amendment addresses "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ." U.S. Const. amend. IV. The Fourth Amendment protects reasonable and legitimate expectations of privacy. *See generally Katz v. United States*, 389 U.S. 347 (1967). Evidence obtained in violation of the Fourth Amendment and evidence derived from it may be suppressed as the "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471 (1963).

"A warrantless arrest of an individual in a public place for a felony, or a misdemeanor committed in the officer's presence, is consistent with the Fourth Amendment if the arrest is supported by probable cause." *Maryland v. Pringle*, 540 US 366, 370 (2003); *see also, Atwater v. Lago Vista*, 532 US 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.") "Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." *United States v. Buckner*, 179 F.3d 834, 837 (9th Cir. 1999) (internal quotation marks and citations omitted). Police officers may rely on the totality of facts available to them when determining whether probable cause exists to make an arrest. *See United States v. Hoyos*, 892 F.2d 1387, 1392 (9th Cir. 1989) (overruled on other grounds). Absent probable cause, a warrantless arrest is illegal. *See Buckner*, 179 F.3d. at 837.

### B. Defendant's Arrest

Wade argues that police lacked probable cause to arrest him at the Palms, and the government disagrees. Under the totality of the circumstances, the court finds that Agent Nestor had probable cause to arrest Wade. Agent Nestor knew the CS and Wade were prior

acquaintances because during the first call, based upon the familiarity of the conversation, Wade immediately recognized the CS when he identified himself, even though he was calling from a different phone. Agent Nestor reasonably believed that Wade had previous drug sales with Wade in Las Vegas because Wade asked the CS whether he was going to see him "for anything that you usually see me for," and expressed his willingness to sell "two for 6K." (Ex. 1A at 1.) Based upon his experience, Agent Nestor knew that meant two pounds of methamphetamine for $6,000, which was a reasonable price for an out of town buyer. Wade's comment is a tacit admission that he had sold drugs to the CS in the past. Agent Nestor confirmed, through official records, that the CS correctly described Wade's vehicle and at least one location where Wade had resided. Later, the CS was able to identify Wade's photograph. Agent Nestor knew that Wade had previously been arrested for drug related activity. The subsequent three telephone calls, monitored by Agent Nestor, made it clear that Wade intended to follow through on his commitment to sell the drugs. Wade agreed to bring cocaine, said he was going out to pick up drugs when the CS told him he was ready to buy, told the CS that "I just got all the shit," meaning the drugs, and was on the way to the Palms, and arrived at the Palms and was arranging to meet the CS on the telephone when he was arrested. (EX. 3A.) Under the totality of the circumstances known to Agent Nestor, a prudent person would have concluded that there was a fair probability that Wade was bringing drugs for sale to the CS.

Wade's argument that there was a lack of information demonstrating the CS's reliability ignores that surveillance and monitoring of the telephone calls corroborated Wade's actions to complete the promised drug sale as the arrangements were being made. In other words, Agent Nestor did not need to rely upon any representations by the CS because, based upon surveillance and telephone call monitoring, Wade was likely making arrangements for the drug sale. At no time did Agent Nestor need to rely on the CS's truthfulness – he confirmed what the CS said, heard Wade's comments, and witnessed Wade's activities to further the sale. The CS provided no information that there would be drugs in the BMW or the apartment – that information came from the on-going operation. Wade's argument that asking for two of the usual could mean a table for two, or that asking for white girl could refer to legal escort businesses in Las Vegas, ignores

Agent Nestor's DEA training and experience interpreting terms used by the CS and Wade during the telephone calls. Police are not "required to eliminate all innocent explanations for a suspicious set of facts to have probable cause . . . ." *Pennsylvania v. Dunlap*, 555 U.S. 964 (2008). Wade argues that the information from the CS was stale because he identified a residence which Wade was not currently associated, and the CS had no information about the Katie apartment or codefendant Loyd. But Agent Nestor confirmed that Wade was in fact associated with the Harbor apartment, as stated by the CS, and learned about the Katie apartment and Loyd from his own investigation after the first CS telephone call. It did not matter that the CS did not know about the Katie apartment or Loyd because Agent Nestor did not rely upon the CS for that information. Thus, this court finds that there was probable cause warranting Wade's arrest.

**C. Search of the BMW**

Wade argues that the search of the BMW without a warrant is per se unreasonable, and the government has the burden to prove an exception to the warrant requirement. The government responds that pursuant to the automobile exception, the vehicle search at the Palms, which produced the methamphetamine and cocaine, was not unreasonable.

In *Carroll v. United States*, the Supreme Court recognized an exception to the Fourth Amendment's warrant requirement when officers search an automobile. 267 U.S. 132, 153 (1925). Originally, the rationale for the exception was the practical challenges of obtaining a warrant for a vehicle that could be "quickly moved" out of the jurisdiction. *Id.* Since *Carroll*, the Court has identified an additional justification for the exception: "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976). This reduced expectation in privacy is based, in part, upon the relative openness of a car's passenger compartment, but the Court has also applied the exception to closed compartments in the vehicle. *See Cardwell v. Lewis*, 417 U.S. 583, 590 (1974); *see also Chambers v. Maroney*, 399 U.S. 42, 44 (1970). The reduced expectation of privacy is also based upon "the pervasive regulation of vehicles capable of traveling on the public highways." *California v. Carney*, 471 U.S. 386, 392 (1985). The automobile exception therefore "justif[ies] searches without prior recourse to the authority of a magistrate so long as the

overriding standard of probable cause is met." *Id.* No exigency beyond that created by the ready mobility of an automobile is required for a warrantless search of a car to fall within the automobile exception. *See Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *see also Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (holding that there need not be an exigency for the automobile exception to apply); *United States v. Hamilton*, 792 F.2d 837, 843 (9th Cir. 1986) (upholding the search of a motor home located in a residential driveway with easy access to a public road because there was probable cause to believe the evidence of crimes would be found).

Here, there is no question that Wade's BMW was readily mobile. The BMW was therefore subject to the regulations which diminish expectations of privacy in the vehicle. The question of probable cause for Wade's arrest has already been analyzed and found to be sufficient – Agent Nestor arrested Wade when he arrived at the Palms because there was a fair probability that he was carrying drugs in the BMW to be sold to the CS. Accordingly, the warrantless search of the BMW was also lawful. Moreover, because probable cause alone justifies the warrantless search of a vehicle, the warrantless seizure of such a vehicle, to move it to the DEA office, also falls within the automobile exception. *See United States v. Bagley*, 772 F.2d 482, 491 (9th Cir. 1985). DEA's movement of the vehicle from the parking lot to the DEA headquarters did not undermine the automobile exception in this situation. *See Michigan v. Thomas*, 458 U.S. 259, 261 (1982) (the search of the vehicle was valid despite the fact that it was not completed until after the vehicle was impounded). Accordingly, the seizure and movement of the vehicle by law enforcement officers for search was not unlawful, and the evidence should not be suppressed.

**D. The Search Warrant for the BMW and the Apartment**

Wade argues that the search warrant authorizing the search of the Katie apartment and BMW was deficient because it relied upon illegally seized evidence, that is, the evidence seized during the automobile search, that there is no nexus between the apartment and the alleged drugs, and that it contains material omissions. The government responds that the BMW evidence was not illegally seized, there is a connection between the apartment and the drug sale, and the omissions are not material to the warrant.

//

### 1. Standing

At the outset, the government questions Wade's standing to challenge the legality of the apartment search. It is axiomatic that an individual seeking to exclude evidence allegedly obtained in violation of the Fourth Amendment must have standing to challenge the illegal conduct that led to the discovery of the evidence. *United States v. Pulliam*, 405 F.3d 782, 785-86 (9th Cir. 2005) (citing *Rakas v. Illinois,* 439 U.S. 128, 134 (1978)) (finding defendant did not have standing to challenge the search of a car in which he was a passenger and seizure of the gun found in the car did not violate his Fourth Amendment rights). The proponent of a motion to suppress has the burden of establishing that his Fourth Amendment rights were violated by the challenged search or seizure. *United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005) (citation omitted) (finding defendant failed to show he had reasonable expectation of privacy in laptop seized by police). "To invoke the protections of the Fourth Amendment, a person must show he had a 'legitimate expectation of privacy.'" *United States v. Nerber*, 222 F.3d 597, 599 (9th Cir. 2000). To establish a legitimate expectation of privacy a person must show (1) a subjective expectation of privacy (2) that society is prepared to recognize as objectively reasonable. *Id.* (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). "A reasonable expectation of privacy may be shown 'either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" *United States v. Thomas*, 447 F.3d 1191, 1197 (9th Cir. 2006). Thus, even though a defendant may lack an ownership interest, he may have standing to challenge a search upon showing "joint control" or "common authority." *Id.* at 1198.

Here, based upon Loyd's statement to Agent Nestor, Wade had complete access to Loyd's Katie apartment at all times, had a key, and left items there, for example, clothing and the title for the BMW. Under these circumstances, Wade has standing to object to the search of the apartment.

### 2. Reliance upon illegally seized evidence

Wade argues that the warrant improperly relies upon the drugs found in the BMW because they were illegally seized. Because the court has determined that the automobile exception

justified the warrantless search of the BMW, the drugs in the BMW were not illegally seized, and it was not improper to reference them in the search warrant affidavit.

### 3. Nexus

Wade argues that the search warrant is defective because there is insufficient connection between the Katie apartment and the BMW and illegal drugs, that is, the affidavit does not support the inference that drugs would be found in the apartment or in the BMW. Wade argues that the main reason to search the apartment was because he had been seen accessing the apartment multiple times, but police had no reason to believe Wade had full access to the apartment, and no reason to believe that there were currently drugs in the apartment. Wade notes that no drug deals had been observed at the apartment, and that he had arranged to sell two pounds of drugs which he went elsewhere to obtain, and the two pounds were seized from the BMW, leaving none to be found in the apartment.

The government responds that telephone data and surveillance confirmed that Wade was frequently at the Katie apartment, that he was at the apartment immediately before he told the CS he was on his way to make the sale, and he went directly to the Palms to complete the drug transaction with methamphetamine and cocaine. Under these circumstances, the government argues that it was reasonable to search the apartment and BMW for evidence of drug trafficking.

In determining whether probable cause exists to search a location, a magistrate judge need only determine that a fair probability exists of finding evidence, considering the type of crime, the nature of items sought, the suspect's opportunity for concealment and normal inferences. *See United States v. Seybold*, 726 F.2d 502, 504 (9th Cir. 1984); *see also United States v. Pheaster*, 544 F.2d 353, 373 (9th Cir. 1976). "Direct evidence linking criminal objects to a particular site is not required for the issuance of a search warrant." *United States v. Jackson*, 756 F.2d 703, 705 (9th Cir. 1985); *see also United States v. Dubrofsky*, 581 F.2d 208, 213 (9th Cir. 1978) (reasonable inferences may be drawn about where evidence might be located). "In the case of drug dealers, evidence is likely to be found where the dealers live." *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986). "When the traffickers consist of a ringleader and

assistants, a fair probability exists that drugs will be present at the assistants' residence as well as the ringleader's." *Id.*; *see also United States v. Foster*, 711 F.2d 871, 879 (9th Cir. 1983).

The affidavit indicates that Wade was known to the CS to be a drug trafficker in Las Vegas, had sold drugs to the CS in the past, and drove a white BMW, which was confirmed by vehicle registration information. The affidavit correctly notes that Wade had been located at, and had access to, the Katie apartment. The affidavit explains that after Wade was contacted by the CS at about 1500 hours to indicate the CS was ready to make the drug buy, Wade was in the area of the cross streets Tropicana and Boulder. The affidavit indicates that Wade returned to the Katie apartment at 1701 hours and entered the apartment with Loyd, and they remained at the apartment for about an hour, until 1757, when they went directly to the Palms. It is a reasonable inference that Wade returned to the apartment in possession of some or all of the drugs, or that the drugs were already at the apartment. It is also reasonable to infer that drugs, or evidence of drug sales such as drug proceeds, would be located at the Katie apartment because that is the last place that Wade was before he went to the Palms to sell drugs to the CS.[3]

Additionally, the affidavit correctly indicates that Wade had access to the Katie apartment, and he had been seen accessing it multiple times. It is a reasonable inference that Wade lived at the apartment, at least some times, and evidence is likely to be located where a drug dealer lives. To find otherwise would mean that only direct evidence may be considered to link criminal objects to a particular site, a requirement the Ninth Circuit has rejected. *See Jackson*, 756 F.2d at 705.

Finally, it is a reasonable inference that Loyd was Wade's assistant in drug trafficking. They apparently traveled together to possibly obtain and deliver the drugs in this case. The affidavit indicates that Loyd was the registered occupant of the Katie apartment. It is therefore likely that drugs would be found in the apartment which was her residence. Because "a fair

---

[3] Agent Nestor testified that the second telephone call, in which Wade said he was going to go "grab the two" occurred at 4:23, not at 1500 hours, and that Wade returned to the Katie apartment at about 5:45, not a 1701 hours. Wade did not discuss these discrepancies, nevertheless, under either set of facts, Wade left the Katie apartment, presumably to "grab the two," and then entered the Katie apartment prior to departing to the Palms to make the drug delivery.

probability existed of finding evidence" at the Katie apartment, there was a nexus between the drugs and the apartment. *Seybold*, 726 F.2d at 504.

Wade also argues that there was insufficient probable cause to justify the search of the BMW. As previously discussed, the affidavit provides sufficient information to infer that Wade used the BMW to obtain the drugs, and to transport the drugs to the Palms for delivery to the CS, and drugs were actually found in the BMW during the lawful warrantless search.[4]

**E. Omissions from the Warrant Affidavit**

Wade next argues that several key details were omitted from the affidavit which would have cast doubt upon whether drugs would be found in the apartment, and that he is therefore entitled to a *Franks*[5] hearing to prove those allegations. Here, the court advised Wade that because an evidentiary hearing was already being conducted to address other arguments in his motion, he could also pursue evidence at the evidentiary hearing regarding his claim that the affidavit omitted important information.

*1. Franks Standard*

In *Franks v. Delaware*, the Supreme Court established a two-prong test for challenging the sufficiency of a search warrant affidavit. 438 U.S. 154. (1978). A defendant is entitled to an evidentiary hearing on the validity of the affidavit underlying a search warrant if he can make a substantial preliminary showing that (1) the affidavit contains intentionally or recklessly false statements or misleading omissions and (2) the affidavit cannot support a finding of probable cause without the allegedly false information. *Id.* at 155-56. "To justify a hearing, a defendant must make specific allegations, allege a deliberate falsehood or reckless disregard for the truth, and accompany such a claim with a detailed offer of proof." *United States v. Craighead*, 539 F.3d 1073, 1080 (9th Cir. 2008) (citation omitted).

Even if a defendant makes the preliminary showing, that is not enough, standing alone, to entitle a defendant to a *Franks* hearing. A defendant must also show that the affidavit would not

---

[4] The court is unaware of whether evidence other than the cocaine and methamphetamine seized immediately after the arrest was discovered in the BMW, but if it was, it should not be suppressed.

[5] *Franks v. Delaware*, 438 U.S. 154 (1978).

be sufficient to support a finding of probable cause even if it was purged of its falsities and supplemented by the omissions. *See United States v. Stanert*, 762 F.2d 775, 782 (9th Cir. 1985) (citing *Franks*, 438 U.S. at 171-72). "The effect of misrepresentations and omissions on the existence of probable cause is considered cumulatively." *Id.* at 782 (citation omitted). Thus, the judge reviewing a request for a *Franks* hearing must determine whether the affidavit, once corrected, would provide a magistrate with the basis necessary to conclude that probable cause exists. *Id.*

In reviewing search warrants, probable cause determinations are made by viewing the "totality of the circumstances" set forth in the affidavit. *See Illinois v. Gates*, 462 U.S. 213, 238-39 (1983). Probable cause is a fluid concept not easily reduced to a set of legal rules. *Id.* at 232. Consequently, the task of a magistrate judge is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. A magistrate judge's determination of probable cause is accorded significant deference, and there is a "presumption of validity with respect to the affidavit supporting the search warrant." *Franks*, 438 U.S. at 171; *see also United States v. Gil*, 58 F.3d 1414, 1418 (9th Cir. 1995).

The defendant "must offer direct evidence of the affiant's state of mind or inferential evidence that the affiant had obvious reasons for omitting facts in order to prove deliberate falsehood or reckless disregard." *United States v. May*, No. 2:08-cr-00012-PMP-GWF, 2009 WL 1542557, at *9 (quoting *United States v. Souffront*, 338 F.3d 809, 822 (7th Cir. 2003)). Deliberate intent or reckless disregard for the truth can be inferred from the omission of material facts that would have negated probable cause, but the "omission rule . . . does not require that the affidavit provide general information about every possible theory that would controvert the affiant's good faith assertion of probable cause." *Id.* (quoting *Craighead*, 539 F.3d at 1081). Omissions are not fatal unless they are made with the intent to deceive the court. *United States v. Nevell*, 58 F. Supp. 2d 1204, 1208 (D. Or. 1999) (citations omitted). As with false statements, a

defendant must also show that the affidavit, once corrected, would not provide a substantial basis to conclude probable existed to issue the warrant. *Stanert*, 762 F.2d at 782.

### 2. *Specific Omissions*

Wade argues that the pattern of omissions in the affidavit proves a reckless disregard for the truth and a manipulation of the facts, and therefore, the state judge was misled. Wade argues first that the affidavit fails to tell the judge that the CS never mentioned the Katie apartment as a residence linked to Wade, but instead identified the Harbor Island apartments as Wade's residence. Second, the affidavit omits that the Katie apartment is located in a different apartment complex than the Harbor Island apartments. Third, it fails to mention that the CS maintained a stash house in North Las Vegas, and fourth, that Wade and Loyd left the Katie apartment for approximately one hour and twenty minutes to get the drugs before the attempted drug sale. Wade argues that not only did the detective omit that Wade went elsewhere to pick up the drugs, he framed the affidavit in a way to suggest that Wade went to the Katie apartment to get them.

The court has already determined that the affidavit sufficiently linked Wade to the Katie apartment, primarily because Wade was known to be observed there in April and May, and was there before he attempted to deliver the drugs. It is true, as alleged by Wade, that the affidavit does not mention that the CS did not refer to the Katie apartment as being linked to Wade. But this is not a material omission. The suspicion that drugs are located in the Katie apartment is not negated by the fact that the CS is unaware of the Katie apartment. Similarly, the absence of evidence of other incidents of drug dealing at the Katie apartment does not mean evidence could not be there under these circumstances. Wade argues that the affidavit fails to note that the Harbor Island apartment is located in a different apartment complex from the Katie apartment. The affidavit contains the street addresses for both locations, making the explanation unnecessary.[6] Similarly, adding to the affidavit that Wade allegedly maintained a stash house in North Las Vegas, a claim which was not substantiated,[7] would not prevent the reasonable inference that

---

[6] Agent Nestor testified that, in spite of efforts to do so, he was unable to ever locate Wade at the Harbor Island apartment.

[7] This claim would have been objectionable for the reason that it was based upon the CS's credibility only.

drugs would be found at the Katie apartment. As Agent Nestor testified, stash houses are temporary, and sometimes are a place to store money, not only drugs.

Wade asserts that the affidavit omits the fact that he left the Katie apartment and went elsewhere, for an hour and twenty minutes, to obtain drugs. Wade argues that if the judge knew that Wade had a Las Vegas stash house, and had to go somewhere to obtain drugs, then the judge might have decided that drugs could not also be at the Katie apartment. Assuming that it is true that Wade went elsewhere to obtain "the two," referring to the methamphetamine which was found in the BMW, Wade nevertheless did return to the apartment before he departed for the Palms. It is Wade's return to the Katie apartment after (apparently) obtaining drugs which allows the inference that evidence of drug transactions – other drugs or proceeds – might be found there. After all, assuming that Wade is a drug dealer (based upon the fact that drugs were brought to the Palms for sale to the CS), it is reasonable to infer that he maintains a supply of drugs as well as the money proceeds of his transactions – items which were sought in the affidavit. A judge is permitted to draw reasonable inferences as to where evidence might be located based on the type of evidence sought and the nature of the criminal activity. *See Angulo-Lopez*, 791 F.2d at 1399.

Contrary to Wade's argument, that affidavit is not framed in a way to suggest that Wade went to the Katie apartment to get the drugs. The affidavit says that at approximately 1500 hours, the CS contacted Wade to advise him that he was ready to make the purchase, and that based upon phone data records, Wade was in the area of Tropicana and Boulder at the time of the call. The affidavit then says that at 1701 hours Wade and Loyd returned to the Katie apartment, and at 1757, the CS called again to arrange delivery, and Wade departed for the Palms. Adding a clarification that Wade departed the apartment for about an hour and twenty minutes before returning does not negate probable cause that evidence of drug trafficking would be found there. Wade could have had a stash house somewhere, or he could have gone somewhere to purchase drugs for resale to the CS between 1500 hours and 1701 hours, and then brought them back to the Katie apartment. The "omission rule" does not require an affiant to provide information about every possible theory that would controvert the good faith assertion of probable cause. *See Craighead*, 539 F.3d at 1081. Moreover, there is no evidence that the detective knew the source

of Wade's drugs, and so there is no basis to support the argument that the detective intended to deceive the judge as to the true source of the drugs.

Wade also argues that the ping data disclosed after the evidentiary hearing shows that the detective overstated the cell phone location data,[8] and that in fact, Wade's cell phone never pinged the Katie apartment. But Wade does not identify any exaggeration in the affidavit. As the government correctly notes, the affidavit simply indicates that the agent used the data obtained from the pen register to locate Wade at the Katie apartment, and followed up with surveillance to determine that he had access to apartment 210 in that apartment complex. Based upon Agent Nestor's testimony, this is true. Adding that the cell phone location data also placed Wade at other apartment locations does not make the affidavit false or misleading, or undermine the reasonable inference that Wade was connected to the Katie apartment.

Wade also argues that the detective overstated Wade's conversation with the CS, which implied that the CS's credibility did not matter. Wade argues that the detective omitted facts that cast doubt on the CS's credibility, for example, that there was no independent evidence of drug dealing, that the CS lived in Montana and that the agents never personally met him, and that the CS was receiving leniency in exchange for cooperation in a fentanyl overdose case which resulted in multiple deaths.

Wade does not explain how the affidavit relies upon CS's credibility. The affidavit indicates that the CS identified Wade as a drug dealer, that Wade drives a white BMW, that he previously sold drugs to the CS, but Wade's identity and an address were independently verified by Agent Nestor, and the affidavit indicates, of course, that he was arrested as he attempted to sell drugs to the CS that day. To the extent that the CS's credibility is an issue, the affidavit does indicate that the CS is attempting to receive consideration for an open case being investigated. It can easily be inferred that the CS is a drug dealer himself because he arranged to buy two pounds of methamphetamine, hardly a personal use amount, from Wade. The court is not persuaded that

---

[8] Wade argues that Wade's telephone was tapped, but there is no such evidence in this case. (*See* Suppl. (ECF No. 48) at 23.)

stating the specific charges the CS was being investigated for in Montana, or that Agent Nestor had not physically met the CS, or that the CS was in Montana during the operation, undermines the justification for the search warrant of the Katie apartment. Adding to the affidavit that the CS believed that Wade maintained an (undiscovered) stash house in North Las Vegas would not undermine the probable cause because a drug dealer can have more than one stash house, or change its location. The court concludes that the CS's credibility is not a material issue. Even if Wade's proposed omissions are added to the affidavit, there remains substantial basis to conclude probable existed to issue the warrant. *Stanert*, 762 F.2d at 782.

Wade argues that the omissions reveal a clear, intentional pattern to selectively include information and overstate facts to bolster probable cause. But as discussed, the omissions are not material to the determination of probable cause. The court is not persuaded that omissions of non-material facts, as argued by Wade, were made with the intent to deceive the court, or that the judge was misled.[9] Accordingly, the court will recommend that the motion to suppress the evidence on the basis of omissions be denied.

**F. Nighttime Search Warrant Provision**

The search warrant approved its execution at night because, according to the affidavit, it was obtained after 1900 hours, and the apartment had been frozen pending the receipt of the search warrant. Wade argues that this was an insufficient justification for a nighttime search provision, and therefore the search was unreasonable. The government responds that Rule 41 of the Federal Rules of Criminal Procedure defines "daytime" as between 6 a.m. and 10 p.m., and the search occurred at 7:50 p.m., and therefore Wade's argument is moot.

Wade notes that a nighttime search requires a higher justification beyond mere probable cause to search, that is, exigent circumstances. *See Bravo v. City of Santa Maria*, 665 F. 3d 1076, 1085-86 (9th Cir. 2011) (involving execution of search warrant for firearms). Exigent

---

[9] Wade admitted that he had the burden of proof, by a preponderance of evidence, to prove the intent to deceive the court. (TR (ECF No. 47) at 7.) Wade argues that the government chose not to call the detective as a witness at the evidentiary hearing to explain his actions, but the court granted Wade's motion for a *Franks* hearing, and he elected not to call any witnesses.

circumstances for a nighttime search are required because a "no-knock" entry at night is dangerous and is a greater intrusion on privacy and carries a higher risk of injury to persons or property. *Id.*

The Fourth Amendment does not contain any time limitations on reasonable searches and seizures. *See* U.S. Const. amend. IV. Rule 41 of the Federal Rule of Criminal Procedure provides that warrants are to be executed "during the daytime," unless the issuing judge for good cause shown expressly authorizes another time. Fed. R. Crim. P. 41(e)(2)(A)(ii). Daytime is defined as "the hours between 6:00 a.m. and 10:00 p.m." local time. Fed. R. Crim. P. 41(a)(2)(B). No specific finding of good cause for a nighttime search is required, however, when there is probable cause to believe that controlled substances will be seized and there are grounds for its service. *See* 21 U.S.C. § 879; *see also Gooding v. United States*, 416 U.S. 430, 452-53, 458 (1974) (holding that Rule 41 does not apply to searches governed by specific narcotics statutes and 21 U.S.C. § 879 requires no special showing for nighttime search). Accordingly, because the search warrant is governed by 21 U.S.C. 879, no special showing would be required for a nighttime search.

Here, the warrant was not served at night. Accepting Wade's argument that the nighttime provision was unsupported, Wade provides no legal support for the proposition that a search warrant containing an unsupported nighttime search provision, but which is executed during the day, constitutes an unreasonable seizure. The logical extension of Wade's argument is that if the nighttime execution clause is defective, it can be executed neither during the day or the night, a conclusion this court rejects.

> Finally, noncompliance with Rule 41 requires suppression of evidence only where, (1) there was 'prejudice,' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.

*United States v. Stefanson*, 648 F.2d 1231, 1235 (9th Cir. 1981). Wade suffered no prejudice because he was not present during the search, and there was no disregard for the Rule because the warrant was not executed at night. Accordingly, the court finds nothing unreasonable in this case

when agents executed the warrant during daylight hours, even if the nighttime execution provision was insufficient.

### III.  CONCLUSION AND RECOMMENDATION

Accordingly, IT IS HEREBY RECOMMENDED that defendant's motion to suppress (ECF No. 38) be DENIED.

### IV.  NOTICE

This Report and Recommendation is submitted to the United States District Judge assigned to this case under 28 U.S.C. § 636(b)(1).  A party who objects to this Report and Recommendation may file a written objection supported by points and authorities within fourteen days of being served with this Report and Recommendation.  Local Rule IB 3-2(a).  Failure to file a timely objection may waive the right to appeal the District Court's Order.  *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: March 7, 2019

_____
C.W. HOFFMAN, JR.
UNITED STATES MAGISTRATE JUDGE